**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**PARK WEST RADIOLOGY, P.C., et al.,**　　　　　　06 Civ. 13516-VM

　　　　　　　　　　　**Plaintiffs,**　　　　　　　(Hon. Victor Marrero)

　　　　　**-against-**

**CARECORE NATIONAL, LLC,**
**CARECORE MANAGEMENT SERVICES,**
**INC., NEW YORK MEDICAL IMAGING**
**IPA, INC., NYMI IPA-O, LLC, NYMI IPA-**
**M, LLC, CCN-HI IPA, LLC, CCN IPA, INC.,**
**CCN WNY IPA, INC., MICHAEL M. ABIRI,**
**M.D., WEST SIDE RADIOLOGY**
**ASSOCIATES, P.C., and ANDREW W.**
**LITT, M.D.,**

　　　　　　　　　　　**Defendants.**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
***IN LIMINE* TO EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFFS'**
**ECONOMIC EXPERT ROBERT MANESS**
**<u>PURSUANT TO RULES 26 AND 702 AND *DAUBERT*</u>**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
*IN LIMINE* TO EXCLUDE THE REPORTS AND TESTIMONY OF PLAINTIFFS'
ECONOMIC EXPERT ROBERT MANESS
PURSUANT TO RULES 26 AND 702 AND *DAUBERT***

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................1

**ARGUMENT** ......................................................................................................2

**I.    MANESS' TARDY OPINIONS AND EXHIBITS SHOULD BE
       STRICKEN** .............................................................................................2

**II.   MANESS FAILS TO MEET THE REQUIREMENTS OF FEDERAL
       RULE OF EVIDENCE 702 AND *DAUBERT*** ......................................3

    A.    MANESS' IDENTIFICATION OF DIRECT COMPETITIVE
       EFFECTS IS NOT A VALID ECONOMIC ANALYSIS ..........................3

    B.    MANESS HAS FAILED TO DEFINE A PLAUSIBLE MARKET.............4

    C.    MANESS HAS FAILED TO INCLUDE PATIENTS COVERED
       BY GOVERNMENT PLANS AND SELF PAY IN HIS MARKET
       CALCULATIONS ...................................................................................5

    D.    MANESS HAS MANIPULATED HIS MARKET SHARE
       CALCULATIONS BY INCREASING THE NUMERATOR AND
       DECREASING THE DENOMINATOR WITH FALSE
       ASSUMPTIONS ......................................................................................7

    E.    MANESS FAILED TO INCLUDE ANY COVERED LIVES OF
       EMPIRE BLUE CROSS BLUE SHIELD/WELLPOINT, THE
       LARGEST COMMERCIAL HEALTH PLAN IN NEW YORK
       COUNTY, IN HIS CALCULATIONS OF MARKET SHARE
       FOR 2005 AND 80% OF COVERED LIVES IN 2006.............................8

    F.    MANESS ERRONEOUSLY INCLUDED ALL COVERED LIVES
       OF AETNA, HIP, OXFORD AND HEALTHNET .................................10

    G.    MANESS ERRONEOUSLY INCLUDED GHI'S COVERED LIVES
       IN CARECORE'S MARKET SHARE .....................................................13

    H.    MANESS SHOULD NOT HAVE INCLUDED UNITED
       HEALTHCARE'S COVERED LIVES......................................................15

### TABLE OF CONTENTS, cont'd

I.    THE CUMULATIVE EFFECT OF THE FLAWS IN MANESS'
      REASONING AND METHODOLOGY REQUIRE THAT HIS
      OPINIONS ON MARKET SHARE BE EXCLUDED IN THEIR
      ENTIRETY .................................................................................16

III.  MANESS' ASSERTIONS WITH RESPECT TO "ONE-STOP
      SHOPPING" ARE BASED ON INCONCLUSIVE, ANECDOTAL
      EVIDENCE ..................................................................................16

IV.   MANESS' REGRESSION ANALYSIS TO SUPPORT ONE-STOP
      SHOPPING WAS FATALLY FLAWED ............................................18

V.    MANESS IGNORED CONTINUOUS VIGOROUS COMPETITION
      AMONG HEALTH PLANS AND AMONG RADIOLOGY BENEFIT
      MANAGERS..................................................................................19

VI.   MANESS' STANDARD FOR IDENTIFYING MARKET POWER IS
      SPURIOUS...................................................................................21

VII.  MANESS' THEORY THAT DECREASED PRICES HURT
      CONSUMERS CONTRADICTS ESTABLISHED ANTITRUST AND
      ECONOMIC PRINCIPLES ...............................................................22

VIII. MANESS' CONCLUSIONS ABOUT REDUCED OUTPUT AND
      QUALITY OF CARE ARE BASED SOLELY ON ANECDOTAL
      INFORMATION..............................................................................23

IX.   MANESS' CLAIMS OF DAMAGES ARE BASED ON MERE
      "GUESSTIMATES" THAT ARE UNRELIABLE AND LIKELY TO
      MISLEAD THE JURY .....................................................................24

CONCLUSION..................................................................................25

# TABLE OF AUTHORITIES

## STATUTES

Civil Justice Reform Act, 28 U.S.C. §§ 471 *et seq.* ...................................................2
Deficit Reduction Act of 2005, S. 1932, Pub. L. No. 109-171......................................19
Fed. R. Civ. P. 26 ..........................................................................................................1
Fed. R. Civ. P. 26(a)(2).............................................................................................1, 2
Fed. R. Evid. 702............................................................................................................1

## CASES

### *United States Supreme Court Cases*

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ...........................4
*Daubert v. Merrell Dow Pharmas., Inc.*, 509 U.S. 579 (1993) .......................1, 13, 17
*Eastman Kodak Co. v. Image Tech. Svcs., Inc.*, 504 U.S. 451 (1992) ...........................21
*General Electric Co. v. Joiner*, 522 U.S. 136 (1997).....................................................13
*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).............................................3, 21
*Pacific Bell Tel. Co. v. Linkline Communs. Tel., Inc.*, 129 S. Ct. 1109 (2009) ...............22

### *United States Circuit Court of Appeals Cases*

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)....................................13
*Brown v. Southeastern Pa. Transp. Auth.*, 35 F.3d 717 (3d Cir. 1994) ...........................3
*Chapman v. New York State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)    5
*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000).......................7, 21
*Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301
    (5th Cir. 1997) ........................................................................................................19-21
*Eastern Food Svcs. v. Pontifical Catholic Univ. Svcs. Assoc.*, 357 F.3d 1
    (1st Cir. 2004)...............................................................................................................7
*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123 (2d Cir. 1995).........21
*Kochert v. Greater Lafayette Health Svcs.*, 463 F.3d 710 (7th Cir. 2006)......................13
*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008)..........13, 15,
    22, 23, 25
*Mitchell v. Gencorp, Inc.*, 165 F.3d 778 (10th Cir. 1999) ..............................................3
*Port Dock & Stone Co. v. Oldcastle N.E., Inc.* 507 F.3d 117 (2d Cir. 2007)...................21
*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57
    (1st Cir. 2004)...............................................................................................................7
*Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277 (8th Cir. 1995) ...................2
*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001).......................................................5
*Washburn v. Merck & Co., Inc.*, 213 F.3d 627 (2d Cir. 2000) .......................................13

## TABLE OF AUTHORITIES, cont'd

***United States District Court Cases***

*Aircraft Gear Corp. v. Kaman Aerospace Corp.*, No. 93 C 1220, 1995 U.S. Dist. LEXIS 13962 (N.D. Ill. 1995) ........................................................................ 2

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692 (N.D. Ill., Feb. 22, 2005) .................................................... 3

*Beller v. United States*, 221 F.R.D. 689 (D.N.M. 2003) ................................. 2

*Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330 (S.D.N.Y. 2009) .......................................................... 5

*In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 U.S. Dist. LEXIS 97289 (S.D.N.Y. 2009) .................................................. 5

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) .....................

*Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan. 1995) ............................ 2

*Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450 (S.D.N.Y. 2001) ................. 4

*Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623 (S.D.N.Y. 2003) ................................. 4, 13

*Smugglers Notch Homeowners' Assoc., Inc. v. Sunderland*, No. 1:08-CV-186, 2009 U.S. Dist. LEXIS 46026 (D. Vt. 2009) ............................................... 5

*Step-Saver Data Sys., Inc. v. Wyse Tech.*, 752 F. Supp. 181 (E.D. Pa. 1990) ................. 3

Defendants, CareCore National, LLC., *et al.*, by their attorneys, Baker & McKenzie, LLP, and Garfunkel, Wild & Travis, P.C., move to exclude the expert reports and testimony of Plaintiffs' economic expert, Dr. Robert S. Maness ("Maness"), pursuant to Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702, and the standards for expert testimony expounded in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

## INTRODUCTION

Maness has filed three reports[2] that purport to support the Plaintiffs' antitrust claims based on his economic expertise. Rather than perform economic analyses of relevant data, the first report presents Maness' identification of "direct evidence" of market power, echoing the conclusory allegations in the Plaintiffs' complaint. Although Maness considered the normal economic expert's task of defining relevant markets "superfluous,"[3] he defined a relevant market and estimated CareCore's market share. He included in his first report one data analysis to support his novel idea of "one-stop shopping." In each case, the methodology was flawed and yielded unreliable conclusions. While Rule 26(a)(2) requires an expert to submit with the Initial Disclosures a written report that contains "*a complete statement of all opinions to be expressed and the basis and therefor,*" later reports from Maness included new opinions and analyses. Fed. R. Civ. P. 26(a)(2).

Aside from the unfairness of Plaintiffs' procedural gamesmanship with late-blooming opinions and analyses from their expert, Maness' opinions have no validity and are not reliable

---

[1] This motion provides the basis for Defendants' objections to PX 01 through PX 031, as set forth in Defendants' objections to Plaintiffs' designated exhibits. *See* Exhibit E to Joint Pretrial Order filed with the Court on Oct. 30, 2009.

[2] Maness (First) Expert Report dated Aug. 29, 2008; Maness Reply (Second) Expert Report dated Dec. 23, 2008; and Maness Supplemental (Third) Expert dated Oct. 16, 2009. The reports will be filed under seal in accordance with the protective order entered in this case.

[3] Maness (First) Expert Report at 3.

because Maness' methodology is flawed. The are impermissibly based on anecdotal evidence and demonstrably erroneous facts and ignore the realities of the markets at issue. In addition, Maness offers a damages opinion that is based on quintessentially unreliable calculations.

## ARGUMENT

## I.    MANESS' TARDY OPINIONS AND EXHIBITS SHOULD BE STRICKEN

While Maness' 73-page first report with 42 pages of exhibits appeared to be a "complete" statement of all of his opinions and the bases for them, as required by Rule 26(a)(2). Clearly, it was not. His Second Report (55 pages plus 34 pages of exhibits) plowed new ground.

Plaintiffs can be expected to argue that there is no prejudice to the Defendants in light of the fact that Defendants had an opportunity to redepose Maness and to submit their expert's rebuttal report. However, Plaintiffs' failure to comply with Rule 26(a)(2) should not be dismissed so lightly. Congress adopted the Civil Justice Reform Act, 28 U.S.C. §§ 471 *et seq.*, and the Federal Rules Committee revised the Federal Rules of Civil Procedure to address the dual problems of cost and delay because of the escalating costs of litigation and the delays in the final disposition of cases. The expert witness disclosure and report provision of Rule 26(a)(2) is specific. The rule mandates disclosure of the identity of the expert together with disclosure of the expert's detailed report. A number of courts have rejected the suggestion that providing a supplemental report before trial and offering to permit the expert to be deposed cures the violation of the rule.[4] Plaintiffs can also be expected to argue that the rule has not been violated because Maness' reply report is merely a rebuttal to Harris's report. It is true that *some* of

---

[4] *See, e.g., Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277 (8th Cir. 1995) (rejecting argument that expert could be deposed allowing other party to discover full extent of the opinion); *Beller v. United States*, 221 F.R.D. 689, 694 (D.N.M. 2003) ("Reopening discovery will not cure the problem."); *Aircraft Gear Corp. v. Kaman Aerospace Corp.*, No. 93 C 1220,

Maness' reply report is a rebuttal to Harris, but not all of it. There are thirty exhibits attached to Maness' Reply (Second) Expert Report. Most of these exhibits contain new analyses or new data. All of Maness' new opinions and analyses should be stricken.[5]

## II.    MANESS FAILS TO MEET THE REQUIREMENTS OF FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*

Aside from the problem of untimely opinions, the Maness oeuvre fails to meet the standards of *Rule 702*. "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589); *Mukhtar v. California State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002) ("The trial court's 'special obligation' to determine the relevance and reliability of an expert's testimony is vital to ensure accurate and unbiased decision-making by the trier of fact.").

An expert's testimony is admissible only if it will assist the trier of fact and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "[U]nder *Daubert*, 'any step that renders the analysis unreliable ... renders the expert's testimony inadmissible." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (quoting *Brown v. Southeastern Pa. Transp. Auth. (In re Paoli R.R.*

---

[5] 1995 U.S. Dist. LEXIS 13962, *1 (N.D. Ill. 1995); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan. 1995). *See also Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 U.S. Dist. LEXIS 10692, *5 (N.D. Ill., Feb. 22, 2005), *rev'd in part on other ground*s, 512 F.3d 1338 (Fed. Cir. 2008) ("A party presents its arguments to the issues for which it has the burden of proof in its initial expert report. And in its rebuttal expert report, it presents expert opinions refuting the arguments made by the opposing party in its initial expert report. The rebuttal report is no place for presenting new arguments…;" *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 752 F. Supp. 181, 193 (E.D. Pa. 1990) (A rebuttal report is not "an opportunity for the correction of any oversights in the plaintiff's case-in-chief.").

*Yard PCB Litig.*), 35 F.3d 717, 745 (3d Cir. 1994)).

### A.  MANESS' IDENTIFICATION OF DIRECT COMPETITIVE EFFECTS IS NOT A VALID ECONOMIC ANALYSIS

Eschewing a market analysis, which he considered unnecessary,[6] Maness presented as his primary opinion a recitation of evidence of direct competitive effects that he said showed that CareCore possessed and exercised substantial market power.[7] This recitation was not an economic analysis. It was a regurgitation of Plaintiffs' claims – that CareCore excluded Park West and other providers from the market by denying their applications to join the networks CareCore manages for its risk contracts and by determining the price it pays the providers who participate in its networks.[8] Where an expert's testimony is nothing more than a repetition of the argument that counsel will make to the jury, it should be excluded. *Rowe Entm't, Inc. v. The William Morris Agency, Inc.*, 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623 (S.D.N.Y. 2003); *Primavera Familienstifung v. Askin*, 130 F. Supp.2d 450, 530 (S.D.N.Y. 2001).

### B.  MANESS HAS FAILED TO DEFINE A PLAUSIBLE MARKET

Though Maness made light of it, market share is an important element of any plaintiff's case relying on Section 1 of the Sherman Act. The analysis of market share begins with the definition of the relevant market. Absent a relevant market there is no meaningful context within which to assess an alleged restraint's competitive effect. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). Maness sought to bolster his direct-effects observation by defining a market and offering an estimate of CareCore's market share. He defined the relevant product market as "the market for *commercially insured* outpatient diagnostic imaging

---

[6] "[T]he exercise of defining the relevant market in which to evaluate the alleged anticompetitive actions is *superfluous.*" Maness (First) Expert Report at ¶ 5 (emphasis supplied).
[7] Maness (First) Expert Report at ¶ 5.
[8] *Id.*

services."[9] This definition omits persons who receive outpatient diagnostic imaging services paid by *government programs* and other non-commercial payors. As explained below, these alternatives are part of the relevant market in this case.[10]

When a proposed relevant market does not encompass all interchangeable substitute products, the expert's methodology does not meet the standard for market definition. *Chapman v. New York State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008) (district court's dismissal of the plaintiff's antitrust claim because the plaintiff failed to define a plausible market affirmed.) The court in *Chapman* cited *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) as follows:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.[11]

Maness' failure to meet the standard for defining a relevant market vitiates all of his opinions about market share and market power. His testimony as to the relevant market, market share, and market power is erroneous as a matter of law and should be disallowed.

---

[9] Maness (First) Expert Report at 24 (emphasis supplied).

[10] Another defect in Maness' proposed market is that CareCore does not compete in the market for outpatient diagnostic imaging services. It does not get paid by health insurers for performing diagnostic imaging. CareCore competes in the market for radiology benefits management services and gets paid for performing those services.

[11] *See also In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628, 2009 U.S. Dist. LEXIS 97289 (S.D.N.Y. 2009) (expert's product market definition of one variety of pineapples failed to fully consider other varieties); *Emigra Group, LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330 (S.D.N.Y. 2009) (plaintiff's proposed market definition – business-related immigration services provided by single-source providers to large companies – sought to limit market to providers who offered broad array of immigration services, but plaintiff failed to show that buyers preferred full-line sellers and would not turn to other providers for some services); *Smugglers Notch Homeowners' Assoc., Inc. v. Sunderland*, No. 1:08-CV-186, 2009 U.S. Dist. LEXIS 46026 (D. Vt. 2009) (plaintiffs' description of vacation areas associated with a particular ski area as "unique" did not explain why a myriad of other options at ski resorts should not be considered substitutes for buyers of vacation property).

C.   **MANESS HAS FAILED TO INCLUDE PATIENTS COVERED BY GOVERNMENT PLANS AND SELF PAY IN HIS MARKET CALCULATIONS**

First and perhaps most importantly, Maness decided, contrary to prevailing law, not to include lives covered by the government plans and people who self pay in his calculation of the market and of CareCore's market share. However, both are purchasers of outpatient diagnostic radiology services and should be considered if the purpose of defining a market and identifying CareCore's market share is to determine the extent to which CareCore has the power to foreclose Park West from the market. Maness' explanation was:

> [C]ommercial insurance represents the majority of covered lives in the state of New York. Given the importance of volume to a practice's success (because of its high fixed costs and low marginal cost structure), an outpatient diagnostic imaging practice would be very unlikely to forego all commercially insured business in the event of a small but significant price decrease. Not accepting the price decrease would mean that the provider could not access those covered lives, and Government programs and self-pay alone are not an adequate substitute for the millions of lives covered by commercial insurance....[12]

The logic of this exclusion is difficult to understand. The same x-ray and MRI equipment is used for both commercial and non-commercial patients. The facility gets paid "per click," that is, every time an image is taken by a technician. Each payment to an imaging facility, whether from a commercial insurer such as Aetna or a governmental program such as Medicare, contributes to the facility's financial health.[13] It does not matter whether a provider excluded from one network or group of payors can replace *all* lost volume with another payor. The impact of the exclusion cannot be gauged without understanding the entire payor mix available to the facility.[14]

---

[12] Maness Reply (Second) Expert Report at ¶ 54; Deposition of Maness, Oct. 23, 2008, at 121-22.

[13] Maness appeared to recognize this when he said: "it makes sense for a provider to take on extra volume as long as the price covers the variable costs." Deposition of Maness, Oct. 24, 2008, at 341-42.

[14] According to the Centers for Medicare and Medicaid Services, there are 2,877,270 people enrolled in Medicare in New York State in 2008. www.statehealthfacts.org.

Contrary to Maness' approach, the law is clear that the product market definition turns on the existence of close substitutes for a particular product and includes the substitute products to which all purchasers can turn (or sellers in the case of Park West). Here, despite plaintiffs' contention, government plans (as the purchasers acting on behalf of their beneficiaries) and other non-commercial payors are available sources of revenue for Park West.

This case is strikingly similar to *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004), where Stop & Shop was excluded from Blue Cross's pharmaceutical network that was managed by PharmaCare. The plaintiff argued that the market should be defined to include only those purchasers who were insured or reimbursed (referred to as "commercial patients"). However, the court rejected this saying:

> [T]he concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier.* Here, for Walgreen and Stop & Shop, their potential customers are presumptively *all* retail customers for prescription drugs – not just that smaller subgroup who are insured or reimbursed.

*Id.* at 67; *see also Eastern Food Svcs. v. Pontifical Catholic Univ. Svcs. Assoc.*, 357 F.3d 1, 3-4, 6-7 (1st Cir. 2004) (finding that the impact of the foreclosure on the supplier depended not on the impact at the university but on how many unforeclosed customers remained elsewhere).

It is well established that expert testimony must "incorporate all aspects of the economic reality of … the market", including "inconvenient" evidence. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000). In this case it is clear, as a matter of law, that the market here should include all purchasers for all patients of outpatient diagnostic radiology services, not just the patients of commercial health plans.

### D.    MANESS HAS MANIPULATED HIS MARKET SHARE CALCULATIONS BY INCREASING THE NUMERATOR AND DECREASING THE DENOMINATOR WITH FALSE ASSUMPTIONS

Market share can be expressed as a fraction, with the numerator representing a firm's

sales or output and the denominator all sales or output. Here, Maness used "covered lives," the number of persons for whom a health plan has financial responsibility, as the unit of measurement to reflect CareCore's supposed market power. Maness' logic is that if CareCore has an exclusive contract to manage the covered lives in an Oxford HMO product, for example, and Oxford has 10,000 covered lives in New York County in its HMO, then CareCore "controls" those covered lives. While not every person among the covered lives will seek diagnostic imaging services in a given year, if they do, they will use CareCore's network of radiologists.

Maness manipulated this market share calculation by unfairly increasing the numerator and unfairly decreasing the denominator. Regardless of whether using covered lives is a suitable proxy for measuring CareCore's market share instead of sales or output, the methodology he employed to identify the proper numerator and denominator unfairly skewed the numbers to produce an unreliable result. The exclusion of government and other non-commercial lives in the denominator is just one of many examples.[15] As is discussed below, the inclusion of covered lives not in CareCore risk networks in the numerator is another example. Based on this manipulation and the unreliable results produced, Maness' testimony should be excluded.

> ### E.    MANESS FAILED TO INCLUDE ANY COVERED LIVES OF EMPIRE BLUE CROSS BLUE SHIELD/WELLPOINT, THE LARGEST COMMERCIAL HEALTH PLAN IN NEW YORK COUNTY, IN HIS CALCULATIONS OF MARKET SHARE FOR 2005 AND 80% OF COVERED LIVES IN 2006

In his First Report, Maness omitted from his calculation of CareCore's market share all covered lives in 2005 and almost 80% of the covered lives in Empire Blue Cross Blue Shield/Wellpoint ("Empire BCBS"), the largest commercial health plan in New York State and

---

[15] Dr. Harris reported that in 2007 there were 648,324 government covered lives, 756,656 commercial covered lives for a total of 1,404,980. *See* Harris Expert Report at Ex. 4.

New York City.[16] Omitting the lives covered by the largest health insurer in New York from the denominator skewed the result upward Maness relied on data from Healthleaders–InterStudy and presented his calculation in his Exhibit 4, "CareCore Share of Private Plan Lives," which, for New York County, was as follows:

| Health Plan | Projected | 2007 | 2006 | 2005 |
|---|---|---|---|---|
| Aetna Inc. | 9.4% | 9.4% | 8.0% | 18.5% |
| Group Health Incorporated | 10.2$ | 10.2% | 13.1% | 24.1% |
| Health Net, Inc. | 3.0% | 3.0% | 3.5% | 5.3% |
| HIP Health Plan of New York | 4.6% | 4.6% | 9.1% | 14.0% |
| Oxford Health Plans (NY), Inc. | 8.5% | 8.5% | 13.1% | 4.9% |
| Oxford health Plans (NJ), Inc. | 0.0% | 0.0% | 0.0% | 0.0% |
| United Health Care of New York, Inc. | 14.9% | X | X | X |
| **Total CareCore Share** | **50.7%** | **35.7%** | **46.8%** | **66.9%** |

Though the point of the exercise was to show that CareCore had market power, to be inferred from a large market share calculation, Maness reported that CareCore's share of his proposed market actually *declined* from a high of 66.9% to 35.7% between 2005 and 2007. (His "projected" column to show a future large market share embraces a separate faulty assumption explained separately below.)

Apparently the gyration in CareCore's market share from a high of 66.9% to a low of 35.7% did not set off any alarms or cause Maness to examine the data more carefully. Only after CareCore's expert, Barry Harris, explained that the InterStudy data used by Maness reported none of Empire BCBS's lives in 2005, only a little bit more than 20% of Empire BCBS's lives in 2006, and a full year of its lives in 2007, did Maness realize he needed to revise his market share

---

[16] Backup for recalculation of CareCore market shares in Maness Reply Exhibit 3 using Maness' estimates for previously missing WellPoint/Empire BCBS covered lives. In 2007, Wellpoint/Empire BCBS had 499,353 covered lives in New York County, a 42.2% market share. (Source: HL-IS data used by Maness).

calculations drastically.[17] As shown in Exhibit 3 of his Second Report, he reduced CareCore's market share from 66.9% to 35.7% in 2005 and from 46.8% to 32.9% in 2006.

This was a serious omission, which Maness should have found before he submitted his First Report. Such a large drop in CareCore's market share over a two-year period would have provoked a competent economist to search for an explanation.

In his Second Report, Maness corrected his error but expressed reluctance to do so. Rather than admitting he should have verified the data before relying on it, he stated that he did "not necessarily agree with making 'one-off adjustments' to third party data that is [*sic*] gathered by way of a proprietary survey process."[18] He did not recall asking his staff to verify the data.[19]

Although there are other errors in Maness' calculation of CareCore's market share, which are noted below, Maness' failure to include Empire BCBS in the market substantially overstated CareCore's market share. On the basis of this error alone, Maness' own calculation of CareCore's market share in New York County drops to a high of 35.7% (in 2005 and 2007) and a low of 32.9% (in 2006), share levels too low to sustain plaintiffs' allegations.[20]

### F.    MANESS ERRONEOUSLY INCLUDED ALL COVERED LIVES OF AETNA, HIP, OXFORD AND HEALTHNET

CareCore only manages the outpatient diagnostic radiology networks for the *risk plans* of Aetna, HIP, Oxford and HealthNet. Nevertheless, Maness included the covered lives of *all* of the plans (i.e., risk and non-risk) Aetna, HIP, Oxford, and HealthNet offer. In other words, if Aetna had 10,000 covered lives in an HMO risk plan where CareCore managed the radiology benefits

---

[17] Maness revised his calculations to take into account the Empire BCBS error in his (Second) Reply Expert Report at 24-25 and (new) Exhibit 3.

[18] *Id.*

[19] Deposition of Maness, Oct. 23, 2008, at 202-03.

[20] Even these market shares are artificially inflated because they do not include the government and other no-commercial payors in the denominator.

and assembled a network of providers and Aetna had another 10,000 lives in a non-risk PPO plan where CareCore did not have that responsibility, Maness attributed all 20,000 Aetna covered lives to CareCore.[21] This elevated the numerator in the calculation of CareCore's market share and raised the percentage reported when these numbers were plugged into Maness' share computation.

Maness' basis for doing this was his assertion that CareCore "*effectively* controls network management and formation" for all the health plans of Aetna, HealthNet, HIP and Oxford not just for risk networks. (Emphasis supplied.) Maness' only support for this far-reaching assumption was snippets from the deposition testimony of five people.[22] For example, Maness cited the testimony of Allyson Schiff, a consultant who was asked:

> Q.     Have you ever been told by anyone at HIP, Aetna, or Health Net that imaging providers applying to any one of their networks should be sent directly to them?
>
> A.     No.[23]

Maness treats her hearsay response as if she were in a position to describe authoritatively the policies of HIP, Aetna, and HealthNet.[24] Maness' citation to testimony of the other witnesses he

---

[21] In 2007, Maness attributed 423,137 covered lives to CareCore for a total market share of 35.7%. However, only 162,841 of these covered lives were shown by the InterStudy data to be in the CareCore risk networks for which CareCore provides network management services. These covered lives account for a 13.7% market share. The InterStudy data used by Maness also show that 138,900 covered lives (an 11.7% share) were in non-risk plans or other plans of Aetna, HealthNet, HIP, and Oxford for which CareCore has no responsibility for network management and, in most cases, has no involvement at all. In addition, as is discussed below, the InterStudy data show that there were 121,396 GHI covered lives (a 10.2% share) improperly included by Maness in the numerator of his market share calculation. That is, the actual covered lives in the CareCore risk networks accounted for only 13.7% of the 35.7% market share calculated by Maness for 2007. The remaining 21.9% of CareCore's market share of 35.7% is due to covered lives improperly included by Maness.

[22] Maness (First) Expert Report at ¶ 86.

[23] Deposition of Allyson Schiff, Jul. 10, 2008, at 120.

[24] Maness cites Ms. Schiff in his (First) Expert Report at ¶ 86, based on her testimony in her deposition at 117-22.

relied on is similarly lacking in reliability. For example, he relied on a selective reference to the testimony of the physician employed by Oxford to work with CareCore, Bartley Bryt, to the effect that Oxford relied on CareCore to gather credentialing information of network applicants. But Maness ignored Bryt's modifier, "*typically,*" ignored his testimony that Oxford was ultimately responsible for deciding what providers to include in its networks, and ignored the testimony about Oxford's direct negotiations with several provider groups (*i.e.*, with no involvement by CareCore).[25] Maness quoted Edward Lucy of HIP as saying, "[I]t is a 'known fact in the radiology community that Oxford, Aetna and HIP use CareCore as a vendor through which you can access the membership of those plans.'"[26] However, he failed to include in his quotation Mr. Lucy's qualifier: "I'm really not sure about [that], because I don't know their contracts…."[27] Similarly, Maness selectively referred to testimony of Barbara Liba, who stated "it is possible" for providers to approach Aetna directly. Finally, Maness cited testimony of CareCore's credentialing manager, Paula Wyda, who was asked whether radiology practices could approach the health plans directly, something she was never in a position to observe.[28]

Maness did no independent investigation or empirical study to verify the assumption he gleaned from the statements he selected from these witnesses. Moreover, he admitted that his assumption had no other factual basis.[29] It is simply not supported by any competent facts.[30]

The distortion that Maness' unfounded assumption causes is significant. According to Maness' assumption, CareCore's "control" of a plan's network is sufficient to include all of the

---

[25] Deposition of Dr. Bartley Bryt, May 13, 2008, at 58, 278-79.
[26] Maness (First) Expert Report at ¶ 86.
[27] Deposition of Edward Lucy, Jul. 2, 2008, at 127.
[28] Deposition of Paula Wyda, Aug. 21, 2007, at 195-97.
[29] Deposition of Maness, Oct. 23, 2008, at 210.
[30] Maness testified he was also told someone called Aetna to inquire about getting into its network and was told to call CareCore. *Id.* This, of course, is double hearsay.

covered lives of that plan in CareCore's market share whether or not the patients covered by that plan ever seek radiology services or actually receive services from CareCore providers. While there is some logic to attributing the covered lives in the risk plans to CareCore (because CareCore receives a payment on a per member per month basis for each of those lives irrespective of whether any one of them ever seeks radiological services), there is no logic to attributing the covered lives in the non-risk plans to CareCore for which CareCore receives no payment on a per member per month or any other basis.

Maness' assumptions are mere speculation. It is well established that "an expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate materials for consideration on a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310-311 (2d Cir. 2008) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996); *Washburn v. Merck & Co., Inc.*, 213 F.3d 627 (2d Cir. 2000)) (holding that expert opinion based on anecdotal reports was properly excluded); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("[a]necdotal evidence and 'generalized assumptions' are inadequate bases for an expert report"); *Rowe Entm't, Inc.,* 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623 at *11 (reliance on anecdotal evidence does not meet *Daubert* reliability test); *Kochert v. Greater Lafayette Health Svcs.*, 463 F.3d 710, 719 (7th Cir. 2006); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (expert's testimony should be excluded where the analytical gap between the data and proffered opinion is simply too great).

### G.    MANESS ERRONEOUSLY INCLUDED GHI'S COVERED LIVES IN CARECORE'S MARKET SHARE

Because CareCore does not have a contract to manage any of GHI's outpatient diagnostic radiology networks, Maness should not have included any of GHI's covered lives in his

13

calculation of CareCore's market share in New York County. CareCore only provides preauthorization services for certain high cost advanced radiology services for GHI covered lives in certain of its HMOs and PPOs. CareCore has no responsibility for providing network management services for those plans. GHI provides its own network management services for those plans. Maness insisted that these GHI covered lives should be included on the theory that CareCore is able to *steer* patients under these plans and therefore *all* of the covered lives for *all* of the GHI plans should be included in CareCore's market share.

As support for his steering theory, Maness cited two instances where individuals were allegedly steered by CareCore, a complaint that was lodged with New York State about CareCore directing GHI patients, and CareCore's alleged admission in answer to Interrogatory 6 that, for a limited period until April 2006, CareCore's sites were listed first on GHI's referral list for risk plans where no outpatient diagnostic radiology site was specified by the patient or the referring physician.

In examining Maness' analysis more closely, it is clear that he has no reliable evidence to support it. First, with respect to CareCore's "admission," the practice of listing CareCore owners first for referrals did not apply to GHI. In Interrogatory Response 6, CareCore explained that the practice of listing CareCore owners first only applied to risk networks with which CareCore had contracts, and the only payor networks with which CareCore had risk contracts were Oxford, Aetna, HIP and Health Net, *not* GHI.[31]

Second, Maness admitted he did not make any effort to investigate the allegations with respect to GHI patients. He did not undertake any statistical analysis or empirical study to determine to what extent, if any, GHI patients were actually steered by CareCore to CareCore

owners.[32] His opinion is without factual basis and based on mere speculation.

Third, the two referrals on which Maness relied are anecdotal and do not provide any basis for including all of the covered lives of GHI. Because anecdotal evidence is highly unreliable, the courts have consistently excluded expert testimony that was based on little more than anecdotal evidence. *See Major League Baseball Props., Inc.*, 542 F.3d 290, and cases cited above. There is no basis for Maness including *any* of GHI's covered lives in *any* of GHI's plans for 2005, 2006 and 2007 in his calculation of CareCore's market share for each of these years.

Maness also noted that GHI is merging with HIP, whose network is managed by CareCore.[33] The speculation that HIP's acquisition of GHI will result in an increased market share for CareCore cannot be the basis to determine CareCore's current market share or to determine damages resulting from CareCore's past conduct. The Sherman Act does not provide a remedy for hypothetical injuries that might occur in the future.

According to Maness' calculations, GHI's market share (not taking into account government lives) ranged from approximately 9% to 13% based on the market shares shown in Exhibit 3 of his Second Report. Because there was no factual basis for including GHI covered lives in the numerator of CareCore's market share calculations, GHI's covered lives and market share should be excluded from the estimate of CareCore's share. When that correction is made Maness' estimate of CareCore's market share would be reduced to 26% or less.[34] Thus, Maness' inclusion of GHI's covered lives in his estimate of CareCore's market share grossly overstated CareCore's market share.

---

[31] Defendants' Amended Response to Plaintiffs' Joint First Set of Interrogatories to Defendants, Oct. 10, 2008, Answer to Interrogatory 6.
[32] Deposition of Maness, Oct. 24, 2008, at 421-22.
[33] Maness (First) Expert Report at ¶¶ 93-95.
[34] Maness Reply (Second) Expert Report at Exhibit 3.

## H.    MANESS SHOULD NOT HAVE INCLUDED UNITED HEALTHCARE'S COVERED LIVES

In his first report Maness included a "projection" which included an additional share of 14.9% attributable to CareCore for United Healthcare's covered lives.[35] However, Maness admitted that CareCore had not gone "active" with United.[36] CareCore's contract with United has not been implemented and may never be.[37] Including these covered lives in CareCore's market share is economically inappropriate.

## I.    THE CUMULATIVE EFFECT OF THE FLAWS IN MANESS' REASONING AND METHODOLOGY REQUIRE THAT HIS OPINIONS ON MARKET SHARE BE EXCLUDED IN THEIR ENTIRETY

Separately, each of these errors or omissions raises serious questions as to the reasoning and methodology used by Maness to estimate CareCore's market share in New York County in the outpatient diagnostic radiology market and would provide a sufficient reason to strike his testimony on this important issue. Collectively, Maness' errors and omissions are fatal to any opinions offered by Maness with respect to market share. They show a lack of regard for prevailing legal requirements, a willingness to rely on speculation and anecdotal evidence, and a failure to verify data, investigate factual allegations, or conduct empirical studies. Thus, Maness' methodology does not meet the intellectual rigor that is required of an economic expert and is likely to confuse rather than educate the jury. His testimony as to CareCore's market share in New York County should be excluded in its entirety.

## III.    MANESS' ASSERTIONS WITH RESPECT TO "ONE-STOP SHOPPING" ARE BASED ON INCONCLUSIVE, ANECDOTAL EVIDENCE

Maness also tries to ramp up CareCore's market share by invoking a novel theory of

---

[35] Maness (First) Expert Report at Exhibit 4.
[36] Deposition of Maness, Oct. 24, 2008, at 333.
[37] Deposition of Donald R. Ryan, May 4, 2008, at 518.

"one-stop shopping." According to Maness, referring physicians seek to avoid the "search costs" of determining which providers are in the network of a particular payor, by simply referring all of their patients to a provider that is included in all or almost all major insurance networks.[38] Maness argued that a provider who was not included in the CareCore networks was foreclosed from the entire market because of physicians' preference for one-stop shopping.

This claim is clearly factually inaccurate, as Maness' own analyses show.[39] Many radiologists and outpatient diagnostic radiology providers that are not in the CareCore networks are able to compete in the market, which is, of course, totally inconsistent with Maness' notion of one-stop shopping. Thus, on its face, the theory is not credible. Even Maness admitted that he knew of no studies or literature that used the term "one stop shopping" the way he did.[40] This is a fatal flaw. Under *Daubert*, 509 U.S. at 594, without any economic literature to support his theory Maness' testimony on one-stop shopping is necessarily unreliable and therefore inadmissible. *See Reed v. Advocate Health Care*, Civ. No. 06 C 3337, 2009 U.S. Dist. LEXIS 89576, *38-39 (N.D. Ill. 2009) (without economic literature, much less peer-reviewed economic literature, an expert's testimony was essentially inadmissible).

In addition, Maness performed no analysis and conducted no empirical studies of physician referral patterns to demonstrate what percentage of physicians in New York County

---

[38] Maness (First) Expert Report at ¶¶ 51-58, 101; 180-83; Maness (Second) Reply Expert Report at ¶¶ 69-72.

[39] In Exhibit 19 of his Reply Report, Maness provides a chart based on physician referral data shown in Exhibit 19 of Harris' First Report. The physician referral data in Exhibit 19 of Harris' First Report were based on the referral patterns of referring physicians before and after HealthNet's non-renewal of its risk contract with a radiology group in Dutchess County in June 2006. The referral data upon which Maness based his chart in Exhibit 19 of his Reply Report show that these referring physicians continued to refer patients of other health plans in large numbers to the radiology group after the radiology group no longer participated in the HealthNet risk network. These referral data refute Maness' one-stop-shopping theory.

[40] Deposition of Maness, Oct. 24, 2008, at 447.

adhere to one-stop shopping for outpatient diagnostic radiology services or otherwise addressed the factual basis of this novel theory. Maness also did not undertake to determine the "search costs" that would be involved in determining whether a physician was in the network of a particular plan.[41] He also failed to explain why any non-CareCore providers were able to compete in this market given if one stop shopping actually existed. Instead, Maness relied on (i) anecdotal evidence; (ii) a regression analysis that was seriously flawed (as explained below) and based on the non-renewal of a contract in Dutchess County, which is irrelevant to this case since it involves entirely different physicians and market structure from the physicians and market structure in New York County; and (iii) the so-called "natural experiment" of Central Queens Imaging, also outside of New York County and thus irrelevant.[42] This limited, essentially anecdotal evidence is not sufficient to justify a theory that on its face is not credible.

## IV.    MANESS' REGRESSION ANALYSIS TO SUPPORT ONE-STOP SHOPPING WAS FATALLY FLAWED

To bolster the one-stop shopping theory in his First Report, Maness included a regression analysis that he claims showed that when a contract with a radiology facility in Dutchess County was not renewed by HealthNet and the facility no longer participated in the HealthNet network managed by CareCore, the facility's payments from other payors declined owing to the "one-stop-shopping" effect he alleges. The non-renewal occurred at the beginning of June 2006 and, accompanying the regression analysis he performed, Maness produced a graph (Exhibit 11) that claimed to depict total payments from all payors (exclusive of Aetna, HealthNet, HIP, and Oxford) to the facility declining after the non-renewal. However, the graph shows a very small decline in payments to the facility in 2006 in the months following the non-renewal and a very

---

[41] *Id.* at 469-73.
[42] Maness (Second) Reply Expert report at ¶¶ 69-90.

large decline between the end of 2006 and the beginning of 2007 before leveling out for the rest of 2007. Maness' methodology failed to consider the Deficit Reduction Act of 2005, S. 1932, Pub. L. No. 109-171. Signed into law in February 2006 and effective on January 1, 2007, the Act significantly reduced the level of payments for radiology services for Medicare patients. Because many payors base their payments on Medicare reimbursement, it also reduced reimbursement from commercial payors. Maness' regression captured the effect of the Act's implementation at the beginning of 2007, not the alleged one-stop-shopping effect. Based on his testimony following the submission of his First Report, it is clear that Maness was barely aware of the Act's existence, and he admitted he did not account for the effect of its implementation in his regression analysis.[43] Failure to take the Act into account in his regression analysis to support the one-stop-shopping claims is a sufficient basis for excluding Maness' analysis in its entirety. Based on an analysis that did consider the Act's impact, the facility's business actually *grew*.[44]

## V. MANESS IGNORED CONTINUOUS VIGOROUS COMPETITION AMONG HEALTH PLANS AND AMONG RADIOLOGY BENEFIT MANAGERS

In considering the competitive impact of CareCore's practices, Maness refused to take into account competition in the radiology benefit manager market in which CareCore competes and the managed care market in which the health plans compete as checks on competition in the outpatient diagnostic radiology market. The reason he should have done so is explained in *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997), which involved a similar claim for foreclosure by a hospital provider excluded from a health care network. The court pointed out that the market among health care plans provides a check on any harm to consumers from the exclusion of a single provider from the network:

---

[43] Deposition of Maness, Oct. 24, 2008, at 485-87.
[44] *See* Expert Report of Barry Harris, Nov. 14, 2008, at ¶¶ 168-71 and Exhibit 16.A.

"Competition among managed care plans checks any anticompetitive effects of market power achievable from aggregating providers of hospital services…." *Id.* at 308. Like Park West, the excluded provider argued that the PPO's structure was inherently suspect in that it was set up to benefit the member hospitals. However, the court held that this contention erroneously ignored the effect of competition between managed care plans on the provider market that would benefit consumers: "Ultimately, [plaintiff] offers no explanation why the presence of competition between managed care providers, which include at least 17 PPOs and several HMOs in the New Orleans area, will not suffice to prevent the imposition of supra-competitive prices." *Id.* at 310.

Similarly, here Maness offers no economically plausible explanation of why the presence of competition among managed care plans and radiology benefit managers does not suffice in this case to prevent anticompetitive conduct by defendants. Any market power CareCore allegedly has is necessarily derived from and is dependent upon it continually obtaining radiology benefit management contracts with health plans. Yet Maness was unwilling to acknowledge this fundamental relationship or recognize its importance.

Maness' only explanation as to why the presence of other radiology benefit managers and other health plans do not suffice to prevent harm to consumers is that managed care organizations "*may* tolerate considerable levels of anticompetitive activity in the downstream market before they would act to police CareCore's conduct."[45] (Emphasis supplied.) Here again Maness relies on mere speculation without any independent investigation, verification, empirical evidence or other substantiation of this claim from the individual health plans in the market. Further, Maness postulates preconditions that would need to be satisfied, where, as he put it, "an upstream competition could limit an anticompetitive exercise of monopsony power in a

---

[45] Maness Reply (Second) Expert Report at ¶ 30.

downstream market."[46] Maness also ignored the facts, as discussed in Harris's testimony, with respect to the competition that CareCore faced and continues to face with respect to these contracts.[47] While Maness has excuses for skipping this step, *Doctor's Hospital* makes it clear that the burden is on the plaintiff to prove that the competition that health plans and radiology benefit managers face has no impact on the alleged restraint at the network level. *Id.*

Once again, Maness' attempt to avoid "inconvenient" evidence renders his opinions unreliable. By ignoring the economic realities of the marketplace, Maness has conveniently failed to take into account all of the relevant factors before rendering his opinion. It is well established that failure to consider all of the relevant factors renders an expert's opinions unreliable and inadmissible. *Kumho Tire Co.*, 526 U.S. at 154; *Concord Boat Corp.*, 207 F.3d at 1055-56. Thus, without any basis or empirical support, Maness ignores this economic reality and his testimony on this issue should be excluded.

## VI.    MANESS' STANDARD FOR IDENTIFYING MARKET POWER IS SPURIOUS

Maness has employed a spurious definition of market power. The Second Circuit has recognized that the definition of market power is the ability of a single seller to *raise* price and restrict output. *Port Dock & Stone Co. v. Oldcastle N.E., Inc.* 507 F.3d 117 (2d Cir. 2007) (Emphasis supplied) (citing *Eastman Kodak Co. v. Image Tech. Svcs., Inc.,* 504 U.S. 451, 464 (1992)). Because CareCore has not raised price, Maness redefined the price component in his definition of market power as the ability to "control" price. He then pointed to an instance where CareCore lowered price – where it lowered the reimbursement rate to members of is network. However, Maness did not show an effect on prices *market-wide*. While CareCore may have lowered the reimbursement rate it paid members of its networks, this did not affect market-wide

---

[46] *Id.* at ¶ 31.

prices. The Second Circuit has made clear that part of the market power standard is the ability to affect prices market-wide. In *Major League Baseball Properties*, 542 F.3d at 308, the court pointed out that to show market power, the plaintiff must show market-wide impact. *See also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir. 1995).

## VII.    MANESS' THEORY THAT DECREASED PRICES HURT CONSUMERS CONTRADICTS ESTABLISHED ANTITRUST AND ECONOMIC PRINCIPLES

Standing antitrust principles on their head, Maness argued that the fact that CareCore has been able to *decrease* prices to consumers demonstrated that CareCore's conduct had an anticompetitive effect in the market.[48] However, unless a competitor can show that the decrease in price is below cost, and that recoupment of lost profits from the below cost pricing is probable, the lower prices are beneficial to consumers and therefore procompetitive. As the Supreme Court pointed out in *Pacific Bell Tel. Co. v. Linkline Communs. Tel., Inc.*, 129 S. Ct. 1109, 1120 (2009):

> "[C]utting prices in order to increase business is the very essence of competition."… In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are "especially costly, because they chill the very conduct the antitrust laws are designed to protect".… To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging prices are too low. Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) "the prices complained of are below an appropriate measure of its rival's costs", and (2) there is a "dangerous probability" that the defendant will be able to recoup its "investment" in below cost prices…." Low prices benefit consumers regardless of how these prices are set, and so long as they are above predatory levels, they do not threaten competition.

Maness did not show CareCore's prices were predatory. He made no analysis of whether any prices were below cost or whether CareCore could recoup lost profits from below-cost pricing.[49]

---

[47] *See* Expert Report of Barry Harris, Nov. 14, 2008, at ¶ 97 and Exhibit 3.
[48] Deposition of Maness, Oct. 24, 2008, at 379-81.
[49] *Id.* at 381-84.

Low prices, according to Maness, can also be evidence of *monopsonistic* behavior.[50] Maness identified the conditions that must exist to establish market power by a monopsonist, citing the text *Microeconomics* authored by Pindyck and Rubenfeld:

> Market power also encompasses the ability of a single buyer (a "monopsonist")…to depress the price paid for a product to a level that is below the competitive price and thereby depress output. The exercise of market power by buyers ("monopsony power") has adverse effects comparable to those associated with the exercise of market power by sellers.[51]

Those conditions cannot be found in this case and Maness did not even attempt to show that they could be met here. First he would have to show that CareCore's allegedly monopsonistic prices were below "the competitive price." However, he did not identify "the competitive price." Second, Maness made no claim and provided no evidence that the lower prices negotiated by CareCore resulted in a reduction of output. By contrast, he reported that providers in CareCore's networks accepted the low reimbursement rates and the volume of business that came from being in the CareCore networks.[52] Of course, the allegedly monopsonistic prices could not have injured Park West because it was never a member of the CareCore network and, thus, was never reimbursed by CareCore. If the low prices injured anyone it would have been the CareCore owners in its network which makes Maness' monopsony theory implausible and illogical.

## VIII. MANESS' CONCLUSIONS ABOUT REDUCED OUTPUT AND QUALITY OF CARE ARE BASED SOLELY ON ANECDOTAL INFORMATION

Maness relied solely on anecdotal evidence to support his opinions on output reduction and quality of care.[53] It is well settled that expert opinions based on anecdotal evidence are unreliable and should not be admitted. *See, e.g., Major League Baseball Props., Inc.*, 542 F.3d at

---

[50] Maness Reply (Second) Expert Report at ¶ 15.
[51] *Id.* at ¶ 15 n.29.
[52] Maness (First) Expert Report at ¶ 67; Maness Reply (Second) Expert Report at ¶ 24.
[53] Maness (First) Expert Report at ¶¶ 121-33; Deposition of Maness, Oct. 24, 2008, at 512-17.

311. Accordingly, Maness' opinion with respect to plaintiff's threshold burden of showing harm to market-wide competition and consumers should be disregarded.

## IX.    MANESS' CLAIMS OF DAMAGES ARE BASED ON MERE "GUESSTIMATES" THAT ARE UNRELIABLE AND LIKELY TO MISLEAD THE JURY

Maness' estimate of damages to Park West caused by defendants' alleged illegal conduct is based principally on the pro forma financial statements that Park West prepared for its banks.[54] According to Maness, these financials "include a number of conservative assumptions" which therefore required some adjustments by Maness.[55] Citing to the deposition of Thomas Varvaro, Maness further explained that these financial projections were presented to secure financing for the equipment and other capital needs.[56] Mr. Varvaro, however, testified that in assisting Park West he was using their projections not his own.[57] Mr. Varvaro also testified that he did not provide any information or do any independent research or investigation with regard to the preparation of these financials.[58] The actual source of these financials was Donovan Spamer, who provided what he called "guesstimates" to Mr. Varvaro for Park West's applications for financing. In his deposition Mr. Spamer explained:

> Q.    Did you participate in the development of any business plans or financial plans for the Park West facility?
>
> A.    I gave estimates, guesstimates on volume, and what I thought was the volume, but no official plans.
>
> Q.    When you say you gave estimates or guesstimates on volume, this would be volume of what?
>
> A.    Of the number of studies that – thought each piece of equipment could do, but nothing formal.

---

[54] Maness (First) Expert Report at ¶ 165.
[55] *Id.*
[56] *Id.* at ¶ 156.
[57] Deposition of Thomas Varvaro, June 9, 2008, at 34.
[58] *Id.* at 44.

        *      *      *

Q.     How did you determine this volume number?

A.     Just from what I – it was basically a guesstimate of what I thought our volume was at Lenox Hill.[59]

Maness' reliance on the financial "guesstimates" is inappropriate and renders his damages report unreliable and inadmissible. Rule 702 requires that expert testimony be "based upon sufficient facts or data." *See generally Major League Baseball Props., Inc.*, 542 F.3d at 311 ("An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment.").

## CONCLUSION

Maness' result-oriented opinions in his expert reports and testimony fail to meet the requirements of Rule 26, Rule 702, or *Daubert* and therefore must be excluded.

---

[59] Deposition of Donovan Spamer, Jan. 25, 2008, at 43-44.

Dated: November 3, 2009              Respectfully Submitted By:

*/s/ Thomas Campbell*
_____

*One of the Attorneys for Defendants*

Thomas Campbell
Roxane Busey
Catherine Ó Súilleabháin
**Baker & McKenzie LLP**
130 East Randolph Drive, Suite 3500
Chicago, IL 60601 USA
Tel.: (312) 861 8884
Fax: (312) 698 2701

Michael J. Keane
Roy W. Breitenbach
Laurie Borgerding Johnson
Jordan Matthew Freundlich
Alicia Mary Wilson
**Garfunkel, Wild & Travis, P.C.**
111 Great Neck Road, Suite 503
Great Neck, NY 11021
Tel.: (516) 393-2263
Fax: (516) 466-5964

CHIDMS1/2740008